**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0230-17T4

T.M.,

     Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES and UNITED
HEALTHCARE COMMUNITY
PLAN,

     Respondents-Respondents.

_____

          Argued January 7, 2019 – Decided February 4, 2019

          Before Judges Fasciale and Gooden Brown.

          On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

          Jane R. Marcus argued the cause for appellant (Disability Rights New Jersey, attorneys; Jane R. Marcus, on the briefs).

Corey S. D. Norcross argued the cause for respondent United Healthcare Community Plan (Stradley Ronon Stevens & Young, LLP, attorneys; Corey S. D. Norcross, on the brief).

Arundhati Mohankumar, Deputy Attorney General argued the cause for respondent New Jersey Department of Human Services, Division of Medical Assistance and Health Services (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Arundhati Mohankumar, on the brief).

PER CURIAM

T.M. appeals from the August 16, 2017 final agency decision of the Director of the Division of Medical Assistance and Health Services (DMAHS), reversing the initial decision of the administrative law judge (ALJ) and reinstating United Healthcare Community Plan's (United) termination of T.M.'s personal care assistance (PCA) services.[1] We affirm.

---

[1] Under N.J.A.C. 10:60-3.3(a), "[h]ands-on personal care assistant services" are described as "[a]ctivities of daily living (ADL)," encompassing assistance with personal hygiene, grooming, toileting, changing bed linens, ambulation, transfers, and eating. Under N.J.A.C. 10:60-3.3(b), "[i]nstrumental activities of daily living (IADL) services are non-hands-on personal care assistant services that are essential to the beneficiary's health and comfort" and include housekeeping duties, laundry, shopping, and other essential errands, and meal preparation. "Health related activities, performed by a personal care assistant" are limited. N.J.A.C. 10:60-3.3(c).

We glean the following undisputed facts from the record. T.M., then twenty-three years old, has spinal muscular atrophy, is paralyzed, and is dependent on a ventilator to breathe. She resides with her grandmother who is also her primary caregiver. For many years, T.M. had been receiving private duty nursing (PDN) and PCA services through Medicaid under the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) program. Under that program, children under the age of twenty-one were eligible to receive any medically necessary service. Once T.M. turned twenty-one and aged out of the EPSDT program, she began receiving Medicaid services through Managed Long Term Services and Supports (MLTSS), administered by United.

MLTSS allowed Medicaid to deliver long-term services and supports at home or elsewhere through Medicaid Managed Care Organizations (MCOs), like United. Under MLTSS, T.M. continued receiving sixteen hours of daily PDN services, totaling 112 hours per week, and four hours of PCA services six days a week, totaling twenty-four hours per week, pursuant to a September 21, 2015 PCA Nursing Assessment Tool, which assessed T.M. as requiring a total of 37.58 hours of PCA services per week. However, on July 29, 2016, following a reassessment of T.M. as required under N.J.A.C. 10:60-3.5(a)(3), "to reevaluate the beneficiary's need for continued [PCA] services[,]" United

advised T.M. by letter that her PCA services were being "terminat[ed]" effective August 5, 2016. The letter explained that based on the "Personal Care Attendant Beneficiary Assessment Tool," T.M.'s "private duty nurse [was taking] care of both [her] skilled needs and [her] personal care needs" and "[her] caregiver [was] completely responsible" for providing "at least eight (8) hours of [her] care every day[,]" which "[was] not currently taking place."

T.M. promptly filed a stage one appeal, which was denied. In an August 3, 2016 letter, United advised T.M. that the decision was based on N.J.A.C. 10:60-5.3, pertaining to PDN eligibility, and N.J.A.C. 10:60-5.9, pertaining to PDN limitations. Additionally, the letter explained that twenty-four hours per week of PCA services were "not medically needed." T.M. filed a stage two appeal, which was also denied for the same reasons in a November 29, 2016 letter. T.M. requested a fair hearing to contest the termination, and the matter was transmitted to the Office of Administrative Law (OAL) pursuant to N.J.S.A. 52:14B-1 to -15, and N.J.S.A. 52:14F-1 to -13. After both parties moved for summary decision pursuant to N.J.A.C. 1:1-12.5, the ALJ granted T.M.'s motion, denied United's cross-motion, and determined that United's "decision to terminate [T.M.'s] PCA hours was not appropriate."

In her initial decision, the ALJ explained:

A-0230-17T4

N.J.A.C. 10:60-5.9(c) limits PDN services to a maximum of sixteen hours per day for 112 hours per week. PCA services are generally limited to forty hours per week pursuant to [N.J.A.C.] 10:60-3.8(g). PDA and PCA are mutually exclusive services and nowhere in the regulations does it dictate that the allowance of one prohibits or limits eligibility as to the other. Actually, [N.J.A.C. 10:]60-5.9(a)(2) prohibits for safety reasons a PDN from performing non[-]medical services. There is no regulation that prohibits PDN and PCA services from occurring at the same time. Since a PDN is prohibited from performing non[-]medical services, United cannot argue that the services of the PDN substitute for those services provided by the PCA.

Furthermore, the [PCA] Nursing Assessment Tool dated September 21, 2015, performed by United, found that [T.M.] was in need of 37.58 hours of PCA services per week. These services are medically necessary to accommodate [T.M.'s] long-term chronic or maintenance health care. [T.M.] is totally dependent and her caretaker grandmother requires assistance in providing [T.M.'s] daily needs of living including transfers, repositioning, grooming, hygiene/bathing, cleaning/laundry, and feeding. In the absence of the assistance of PCA services, [T.M.] would not be able to be maintained at home and would require long[-]term in[-]patient care in a nursing facility. The goal of PCA services is to maintain disabled persons such as [T.M.] in their homes to the fullest extent possible because it is better for the patient and more cost[-]effective for the State of New Jersey.

In rejecting United's reliance on "its contract with the State as authority for terminating [T.M.'s] PCA services[,]" the ALJ stated "[t]he rules governing the administration of the Medicaid program originate from State and federal law,

5

and not a contract between a state agency and an insurance company." Thus, "[t]he contract with United cannot circumvent [T.M.'s] entitlement to PCA services pursuant to the regulations."

United filed exceptions to the ALJ's initial decision, and, on August 16, 2017, the DMAHS Director issued a final agency decision reversing the ALJ's decision and reinstating United's termination of T.M.'s PCA services. The Director posited that the dispute "focuses on whether [T.M.] may also receive [twenty-four] hours of weekly PCA services in addition to the [sixteen] hours of [daily] PDN she receives." The Director determined that while "the ALJ [was] correct that there [was] no explicit prohibition in the regulations disallowing the provision of PCA services," in this case, "regulatory and contractual requirements . . . preclude[d] T.M. from receiving more than [sixteen] hours per day of hands-on care and require[d] the primary caregiver to perform [eight] hours of daily hands-on care."

To support her decision, the Director relied on N.J.A.C. 10:60-5.9(c) and N.J.A.C. 10:60-6.3(b)(2),[2] as well as the MCO contract. N.J.A.C. 10:60-5.9(c) provides:

---

[2]  N.J.A.C. 10:60-6.3(b)(2), addressing PDN for the State's prior Medicaid waiver program, has since been repealed. N.J.A.C. 10:60-6.3(b)(2) provided:

A-0230-17T4

Private duty nursing services shall be limited to a maximum of [sixteen] hours, including services provided or paid for by other sources, in a [twenty-four] hour period, per person in MLTSS. There shall be a live-in primary adult caregiver who accepts [twenty-four] hour per day responsibility for the health and welfare of the beneficiary . . . .

. . . .

The adult primary caregiver must be trained in the care of the individual and agree to meet the beneficiary's skilled needs during a minimum of eight hours of care to the individual during every [twenty-four] hour period.

According to Article 9 of the MCO contract,

. . . Members are counseled on the program[s'] inability to provide [twenty-four] hour care and advised that the total [PDN], [PCA][,] and Self Direction total services limit is [sixteen] hours per day. This is in accordance with N.J.A.C. 10:60-6.3(b)(2)[,] which indicates that a live-in primary adult caregiver who accepts [twenty-four] hour responsibility for the health and welfare of the beneficiary . . . is required to provide a minimum of

Private duty nursing shall be provided in the community only, not in an inpatient hospital setting. The beneficiary shall have a live-in primary caregiver (adult relative or significant other adult) who accepts [twenty-four] hour responsibility for the health and welfare of the beneficiary. A maximum of [sixteen] hours of private duty nursing, from all payment sources, may be provided in any [twenty-four] hour period. A minimum of eight hours of hands-on care shall be provided by the primary caregiver.

eight (8) hours of hands[-]on care daily.  [PDN] is not
permitted to overlap with [PCA] or Self Direction hours
as these services are included in [PDN] and thus
considered a duplication of services . . . .

The Director concluded that "[T.M.'s] receipt of additional care in the form of PCA services [was] contrary to the regulations" and "directly overlap[ped] with the care that [T.M.'s] caregiver [was] required to provide."  In support, the Director relied on the fact that "the regulations impose[d] a [sixteen] hour daily limit on PDN from all sources[,]" "[eight] hours of [T.M.'s] PDN care" had to "be provided by her caregiver grandmother[,]" and "[t]he MCO [c]ontract also specifically preclude[d] MLTSS recipients from receiving PDN and PCA assistance simultaneously[,]"  The Director described T.M.'s argument that the additional PCA services were permitted because they were "not specifically precluded by the PCA regulations," as "puzzling in light of the purpose and intent of the PCA program[,] which is to provide assistance with specific health related tasks[,]" both skilled and unskilled, which in T.M.'s case were "indisputably being provided by her private duty nurses and her grandmother."

The Director pointed out that in finding "no duplication of services if T.M. . . . receiv[ed] both PDN and PCA [services,]" the ALJ "mistakenly conclude[d]

that the private duty nurse [was] prohibited from performing non[-]medical services, []such as bathing and feeding."  The Director explained:

> This is simply not true.  The prohibition on a private duty nurse from performing non[-]medical tasks only applies when the nurse and the beneficiary are outside of the home.  [See N.J.A.C.] 10:60-5.9(a)(2).  Moreover, PCA is a delegated nursing task.  Indeed, a certified homemaker-home health aide "is employed by a homecare services agency and who, under the supervision of a registered professional nurse, follows a delegated nursing regimen or performs other tasks that are delegated." [N.J.A.C.] 13:37-14.2.  It simply makes no sense that [T.M.'s] private duty nurse would delegate a task while she is in the home and fully capable of performing those tasks.  This is evident pursuant to T.M.'s plan of care and the actual private duty shift notes which show that the private duty nurse is expected to, and, in fact, does address T.M.'s skilled as well as her unskilled needs. . . .  Significantly, the shift notes show that the nurse regularly provides assistance with the ADL and IADL tasks identified in the plan of care. . . .  Thus, T.M.'s PCA services are not medically necessary as they are duplicative of the services she already receives through her [sixteen] hours of private duty nursing along with the [eight] hours of hands-on care that her grandmother provides.

The Director also rejected T.M.'s contention "that she [was] . . . denied due process because United . . . failed to provide adequate notice explaining the basis for the termination of her PCA services."  According to the Director, "'taken as a whole,'" United's "notices advised [T.M.] that her PCA services were

9

being terminated along with an explanation for the termination and the supporting regulations."

> Moreover, the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. Matthews v. Eldridge, 424 [U.S.] 319, 333 (1976). Thus, assuming [arguendo] that the notice was inadequate, inadequate notice is a procedural defect that may be cured by a [de novo] hearing. In re Appeal of Darcy, 114 [N.J. Super.] 454, 461 (App. Div. 1971). Here, [T.M.] was afforded due process by this OAL hearing and the continuation of PCA services pending the outcome of the appeal.

This appeal followed.

On appeal, T.M. raises the following arguments for our consideration:

> I.   THE REGULATORY BASIS STATED IN THE NOTICES FOR TERMINATING T.M.'S PCA SERVICES IS NOT A LEGAL BASIS FOR TERMINATING SUCH SERVICES.

> II.  THE CONTRACT BETWEEN THE STATE AND UNITED CANNOT BE RELIED UPON AS A BASIS FOR TERMINATING T.M.'S PCA SERVICES.

> III. . . . UNITED'S OWN ASSESSMENT FOUND T.M. MEDICALLY NEEDY AND ELIGIBLE FOR PCA SERVICES.

> IV.  UNITED FAILED TO PROVIDE ADEQUATE NOTICE OF THE TERMINATION OF PCA SERVICES.

10

Our role in reviewing agency decisions is limited. R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 260-61 (App. Div. 2014). Because "a 'strong presumption of reasonableness attaches to [an agency decision,]'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994)), "[a]n administrative agency's decision will be upheld 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" R.S., 434 N.J. Super. at 261 (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

In determining whether agency action is arbitrary, capricious, or unreasonable, our role is restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [Ibid. (quoting H.K. v. Div. of Med. Assistance & Health Servs., 379 N.J. Super. 321, 327 (App. Div. 2005)).]

"Deference to an agency decision is particularly appropriate where the interpretation of the [a]gency's own regulation is in issue." Ibid. (quoting I.L. v. N.J. Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 389 N.J. Super. 354, 364 (App. Div. 2006)). "Nevertheless, 'we are not bound by the agency's legal opinions.'" A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 340 (App. Div. 2009) (quoting Levine v. State, Dep't of Transp., Div. of Motor Vehicles, 338 N.J. Super. 28, 32 (App. Div. 2001)). Indeed, "[s]tatutory and regulatory construction is a purely legal issue subject to de novo review." Ibid. (citing Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

Relevant here, when the agency head rejects or modifies the ALJ's "findings of fact, conclusions of law[,] or interpretations of agency policy in the decision," the agency head "shall state clearly the reasons for doing so." N.J.S.A. 52:14B-10(c). The agency head may not reject or modify any credibility findings of the ALJ "unless it is first determined from a review of the record that the findings are arbitrary, capricious[,] or unreasonable or are not supported by sufficient, competent, and credible evidence in the record." Ibid.

Turning to the pertinent aspects of the Medicaid program, "[t]he federal Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to

1396w-5, mandates a joint federal-state program to provide medical assistance to individuals 'whose income and resources are insufficient to meet the costs of necessary medical services.'" E.B. v. Div. of Med. Assistance & Health Servs., 431 N.J. Super. 183, 191 (App. Div. 2013) (quoting 42 U.S.C. § 1396-1). Although a state is not required to participate, "[o]nce a state joins the program, it must comply with the Medicaid statute and federal regulations." Ibid. "The New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5, authorizes New Jersey's participation in the federal Medicaid program." Id. at 192. DMAHS is the agency within the State Department of Human Services that administers the Medicaid program. N.J.S.A. 30:4D-7. Accordingly, DMAHS is responsible for protecting the interests of the New Jersey Medicaid program and its beneficiaries. N.J.A.C. 10:49-11.1(b); see E.B., 421 N.J. Super. at 192.

MLTSS is the Medicaid program at issue here. As a recipient of services under MLTSS, T.M. was subject to the regulatory proscriptions of N.J.A.C. 10:60-5.9(c), which limited PDN services to a maximum of sixteen hours daily, and required the primary caregiver to provide a minimum of eight hours of care daily. Combined, the regulation ensures a total of twenty-four hours of daily care. PDN services include assistance with ADL, and the primary caregiver

provides hands-on care. Therefore, inasmuch as the services provided by T.M.'s PCA were already being provided by her PDN and her grandmother, and services cannot logically exceed twenty-four hours per day, as the Director determined, the PCA services were duplicative and medically unnecessary.

We reach this conclusion notwithstanding the fact that PCA services are not expressly prohibited by the Medicaid regulations. As the agency responsible for protecting the interests of the New Jersey Medicaid program and its beneficiaries, we are satisfied that the Director's decision that Medicaid funds should not be used to subsidize duplicative services is hardly arbitrary, capricious, unreasonable, or lacking fair support in this record.

T.M.'s assertion that "[t]he PCAs are not in the home during the PDN['s] shift, but only come for four hours during the eight hours T.M.'s grandmother is home with T.M. and responsible for her care" confounds her argument. Indeed, on the days when T.M. receives four hours of PCA services in addition to sixteen hours of PDN care, for a combined total of twenty hours of care, T.M. is in clear violation of N.J.A.C. 10:60-5.9(c)'s requirement that her grandmother provide a minimum of eight hours of hands-on care.

We also reject T.M.'s contention that the Director erred in relying on the MCO contract as a basis for terminating the PCA hours. The contract merely

parroted and paraphrased the regulations pertaining to PDN services. Likewise, we reject T.M.'s argument that the decision was contrary to the earlier Assessment Tool which showed that T.M. required PCA services in excess of what she had been receiving. On the contrary, the Director's decision ensured that T.M. would be receiving the needed PCA services, but through her PDN and grandmother, rather than the PCAs.

Equally unavailing is T.M.'s contention that she was denied due process because United failed to provide timely and adequate notice explaining the basis for the termination of her PCA services as required by N.J.A.C. 10:49-10.4(a). We agree with the Director that any deficiency was cured by T.M. receiving a de novo hearing with continued PCA services pending appeal. See N.J.A.C. 10:49-10.4(d)(1) (requiring DMAHS to "reinstate and continue services until a decision is rendered after a hearing" if "[a]n action is taken to terminate, suspend or reduce . . . covered services without affording claimants adequate advance notice"); Ensslin v. Twp. of N. Bergen, 275 N.J. Super. 352, 361 (App. Div. 1994) (explaining that procedural irregularities are considered cured by a subsequent plenary hearing at the agency level); Matthews, 424 U.S. at 333 (noting that the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner).

15

"'[E]ven though [we] might have reached a different result[,]'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)), we "may not substitute [our] judgment as to the wisdom of an administrative action so long as it is statutorily authorized and not otherwise defective." K.P. v. Albanese, 204 N.J. Super. 166, 176 (App. Div. 1985). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" In re Stallworth, 208 N.J. at 195 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)). Ultimately, the party challenging an agency's action bears the burden of demonstrating that the decision is arbitrary, capricious, or unreasonable. In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006); see also Barone v. Dep't of Human Servs., 210 N.J. Super. 276, 285 (App. Div. 1986), aff'd, 107 N.J. 355 (1987). T.M. has not met her burden here.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0230-17T4