913 A.2d 122 (2006)
389 N.J. Super. 354
I.L., Petitioner-Appellant,
v.
NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted January 25, 2006.
Decided July 25, 2006.
*123 Buchanan Ingersoll, for appellant (Ivan J. Punchatz, of counsel; Mr. Punchatz and Brian N. Rath, on the brief).
Nancy Kaplen, Acting Attorney General, for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Julie Hubbs, Deputy Attorney General, on the brief).
Before Judges WEFING, WECKER and GRAVES.
The opinion of the court was delivered by
WECKER, J.A.D.
This is an appeal from a final agency decision of the Division of Medical Assistance and Health Services. The decision reversed the findings and conclusions of the Administrative Law Judge and denied Medicaid Only benefits to a nursing home patient, I.L., on the ground that her countable *124 assets exceeded the allowable maximum.[1] At issue is the period June 1, 2002 through December 31, 2004. There is no dispute that I.L. was ineligible prior to June 1, 2002 and eligible as of January 1, 2005.
The question presented by this appeal is whether an individual is eligible for the Medicaid Only program when she was the legal owner of life insurance whose value ordinarily would have disqualified her for a brief period, but because she suffered from dementia and likely from Alzheimer's disease, and because no guardian had power over her assets, the cash value of the policies was not accessible to her. As of June 1, 2002, I.L. owned three life insurance policies having a total cash surrender value of $5,913. To be eligible for the Medicaid Only program, an applicant may not own total countable resources that exceed $2,000. See N.J.A.C. 10:71-4.4(b)3. The issue is whether petitioner's medical condition rendered these assets "not accessible" under N.J.A.C. 10:71-4.4(b)(6), thereby excluding the cash value of the life insurance policies from petitioner's countable resources.
We now hold that the cash value of I.L.'s insurance policies was not accessible to her on June 1, 2002, and contrary to the determination of the Division, she was eligible for benefits as of that date. We therefore reverse.
These are the salient facts and the relevant procedural history gleaned from the record on appeal. Three separate applications for Medicaid Only benefits were filed on behalf of I.L. between 2001 and 2004. Each application was rejected by the Atlantic County Board of Social Services.[2] Petitioner's daughter, G.A.T., filed the first application on her behalf in August 2001; the Board denied that application in October 2001 for failure to provide required documentation, including proof of I.L.'s financial circumstances. See N.J.A.C. 10:4.2(b) and (c). Petitioner's granddaughter, K.T., filed the second application on her behalf in May 2002. The Board did not act upon that application for more than a year, until June 2003, when it again denied petitioner's application for failure to provide required documentation.[3] The third and final application on I.L.'s behalf was filed with the Board in June 2004. That application was filed by Absecon Manor Nursing and Rehabilitation Center, where petitioner had resided since June 2002. The Board denied the third application in August 2004 on the ground that I.L. owned "countable resources" in excess of $2,000, thereby rendering her ineligible for the Medicaid Only program. See N.J.A.C. 10:71-4.5(c). The countable resources cited by the Board were three life insurance policies with a combined cash value of $5,913.34.
Appeals from the Board's decisions on both the second and third applications *125 were filed with the Division. The appeals were referred to the Office of Administrative Law (OAL) as contested cases and consolidated in September 2004. The consolidated appeals were heard in the OAL.
These are the relevant facts that were before the administrative law judge. On May 2, 2002, I.L. was found on the floor of her apartment in a confused state and admitted to the Atlantic City Medical Center. I.L. was eighty-five years old in May 2002 and suffering from Alzheimer's disease with severe dementia; she had a history of hypertension and had previously suffered a stroke.
After several weeks in the hospital, I.L.'s granddaughter sought to have her moved to a nursing home. On May 7, 2002, the New Jersey Department of Health and Senior Services approved I.L.'s placement in a nursing facility, under a pre-admission screening program. See N.J.S.A. 30:4D-17.10 to -17.15. The approval was contingent upon a determination that I.L. was eligible for Medicaid benefits. On May 17, I.L.'s granddaughter filed an application with the Board to enroll I.L. in the Medicaid Only program, and on May 28, 2002, her granddaughter completed an application for residence with Absecon Manor on her grandmother's behalf. Three days later, on May 31, petitioner was admitted to Absecon Manor.
After I.L.'s admission, it appears that I.L.'s daughter and granddaughter abandoned her to the care of the nursing home. They did not cooperate in dealing with the Board or with Absecon Manor. After learning that the Board had denied I.L.'s application for Medicaid benefits for failure to provide documentation, Absecon Manor began compiling the required documentation of I.L.'s financial resources and discovered that she owned two bank certificates of deposit before her admission to Absecon Manor. The record clearly establishes that I.L.'s daughter and granddaughter withdrew the entire balance in each certificate, more than $37,000, and closed the accounts before her May 2002 hospitalization.[4] Apparently as a result of I.L.'s ownership of those accounts and the transfers without consideration within the thirty-six month "look back" period, see N.J.A.C. 10:71-4.10, I.L. was determined to be ineligible for Medicaid benefits through May 31, 2002.
Having compiled the necessary documentation, Absecon Manor filed I.L.'s third application with the Board.[5] Absecon Manor reported that I.L. still owned three life insurance policies, with cash surrender values of $2,821, $997, and $2,095, respectively, or a total of $5,913.[6] The Board, citing the $5,913.34 total value of those life insurance policies, concluded that I.L. was ineligible for the Medicaid Only program. See also N.J.A.C. 10:71-4.5(c). *126 As of October 7, 2004, Absecon Manor had not been reimbursed for over $100,000 allegedly spent to provide services to I.L.
Administrative Law Judge Bruce M. Gorman heard arguments and issued an Initial Decision concluding that petitioner's insurance policies were not countable assets for purposes of determining her Medicaid eligibility. The decision reversed the Board's denial of benefits for the contested period.
We agree with the administrative law judge's conclusions with respect to the second and third applications. Addressing the denial of the second application (for failure to supply required documentations), the judge said:
Three factors caused the delay in producing the requested information. First, petitioner's mental condition rendered her incapable of assisting the process. Second, her immediate family failed to cooperate. Indeed, the immediate family had no reason to cooperate and every reason not to cooperate, given that the daughter and granddaughter had gained financially from the transfer of assets within the look-back period, and given that Absecon Manor was providing care for the petitioner.
With respect to the third application, the judge wrote:
I must agree with petitioner's analysis. Based upon petitioner's mental incapacity together with the refusal of her family to cooperate, I FIND and CONCLUDE that the three insurance policies are not accessible to petitioner through no fault of her own. Accordingly, I further FIND and CONCLUDE that the said insurance policies do not constitute countable assets for purposes of determining Medicaid eligibility.
This holding does not mean that the three insurance policies should pass on to petitioner's heirs. Once a Law Guardian is appointed by the Superior Court, that guardian must pursue the surrender of the cash value of the insurance policies, and those monies must be paid over to respondent as reimbursement. But the mere existence of those policies, not accessible to petitioner under the facts of this case, should not defer her Medicaid eligibility. That eligibility commenced June 1, 2002.
After May 31, 2002, petitioner was without means. Absecon Manor provided services to petitioner subsequent to that date. There is no logical reason, nor is there any reason in law why Absecon Manor should not be permitted to recoup those monies. The inability of petitioner to provide proper identifying documentation at the time or to surrender her insurance policies is wholly understandable, given her dementia. Absecon Manor is to be complimented, not penalized, for taking her in and then expending the effort to locate petitioner's assets, and finally to pursue an appropriate legal guardian for her.
For all the reasons set forth above, I FIND and CONCLUDE that petitioner's assets fell below the mandated $2000 level on June 1, 2002. Consequently, I further FIND and CONCLUDE that petitioner's eligibility for Medicaid began on June 1, 2002, and the determinations of respondent must be REVERSED.
The Director reversed the Initial Decision, inferring that the nursing home was the real party in interest and that the administrative law judge improperly applied the doctrine of equitable estoppel to hold the Board responsible for the apparent advice of I.L.'s case worker.
In rejecting the judge's conclusions, the Director gave this explanation:

*127 The Initial Decision found that three insurance policies were not available through no fault of Petitioner and are not countable assets. Moreover the decision states "there is no logical reason, nor is there any reason in law why Absecon Manor should not be permitted to recoup those monies [spent on I.L.'s care]." However there is a long established principle in law that prevents I.L. from establishing the eligibility necessary to allow Absecon to bill for its services.
In essence, the Initial Decision is applying the doctrine of equitable estoppel against the State without discussing the legal theory and standards behind the doctrine. Significantly, the courts in New Jersey have rarely applied the doctrine of estoppel to governmental entities absent a finding of malice, Cipriano v. Department of Civil Serv., 151 N.J.Super. 86, 91, 376 A.2d 571 (App. Div.1977), particularly when estoppel would "interfere with essential governmental functions." Vogt v. Borough of Belmar, 14 N.J. 195, 205, 101 A.2d 849 (1954).
[(Alteration in original).]
We agree that the doctrine of equitable estoppel is disfavored against a public entity, e.g., County of Morris v. Fauver, 153 N.J. 80, 104, 707 A.2d 958 (1998), and does not apply here. But we find no basis for the Director's inference that the judge's ruling was based on an application of equitable estoppel against the State.
As we said, Absecon Manor filed the third application on petitioner's behalf in June 2004. Shortly after that application was denied, on September 20, 2004, the nursing home filed a complaint in Superior Court seeking the appointment of a legal guardian for petitioner. After finding that I.L. was "an incapacitated person as a result of unsoundness of mind and is incapable of governing her affairs," the court on November 19, 2004, appointed the Public Guardian as legal guardian for I.L. pursuant to N.J.S.A. 3B:12-25. Not surprisingly, the Public Guardian quickly spent down the value of petitioner's life insurance policies. The Division's own regulations recognize that "[a]s of November 2003, the average cost [of nursing home services in New Jersey] is $6,050." N.J.A.C. 10:71-4.10(m)1. As a result of the Guardian's spend down, the Board found petitioner "eligible to receive Medicaid benefits retroactively to January 1, 2005." The Board rejected her 2002 application on the basis of treating the insurance policies as a countable resource. It did not announce or communicate that rejection until June 2003.[7]
We turn now to legal analysis of the Director's determination that I.L. was ineligible for benefits on June 1, 2002 and continuing through December 31, 2004, solely on account of her ownership of those insurance policies with a cash value above the permissible $2,000 cap by some $3,913 ($5,913 less $2,000).
N.J.A.C. 10:71-4.1 provides the "resources criteria and eligibility standards" for Medicaid applicants. N.J.A.C. 10:71.4.1(a). "[A] resource shall be defined as any real or personal property which is owned by the applicant . . . and which could be converted to cash to be used for his/her support and maintenance." N.J.A.C. 10:71-4.1(b). "[N]onliquid resources shall be considered in the determination of eligibility, unless such resources are specifically excluded under . . . *128 N.J.A.C. 10:71-4.4(b)." Ibid. (Emphasis added.) Moreover, "[i]n order to be considered in the determination of eligibility, a resource must be `available.'" N.J.A.C. 10:71-4.1(c). Availability exists when, among other conditions not relevant here, "[t]he person has the right, authority, or power to liquidate . . . property. . . ." N.J.A.C. 10:71-4.1(c)1.
There is no dispute that I.L. owned the policies in issue, that they had cash value, and that they were available in the sense that I.L. had the right to liquidate those policies. Moreover, N.J.A.C. 10:71-4.2(a) provides that "[a]ny resource which is not specifically excludable under the provisions of N.J.A.C. 10:71-4.4 shall be considered a countable resource for the purpose of determining Medicaid Only eligibility." Contrariwise, "[a] resource which is classified as excludable shall not be considered . . . in the determination of eligibility for participation in the Medicaid Only Program." N.J.A.C. 10:71-4.4(a). If a resource is expressly "excludable" under N.J.A.C. 10:71-4.4, then it is not "countable" under Section 4.2, irrespective of Section 4.1. The determinative issue then, under both N.J.A.C. 10:71-4.1 and -4.2, is whether I.L.'s insurance policies were excludable under N.J.A.C. 10:71-4.4.
N.J.A.C. 10:71-4.4(b) lists ten categories of excludable resources. The categories potentially relevant to I.L.'s applications are:
4. The cash surrender value of all life insurance policies owned and in the control of the individual, if the total face value of such policies does not exceed $1,500 . . . [but] [i]f the total face value of such policies exceeds $1,500, the total cash surrender value of all policies shall be included as a resource, countable toward the appropriate resource maximum.
. . . .
6. The value of resources which are not accessible to an individual through no fault of his or her own.

[Emphasis added.]
The cash value of I.L.'s life insurance policies exceeded $1,500 as of June 1, 2002, thus exclusion 4 does not apply. Exclusion 6 is the disputed and potentially available exclusion.
I.L. argues, and the administrative law judge found, that the cash surrender value of the life insurance policies was "not accessible [to her] through no fault of . . . her own," because she was not capable of handling her financial affairs at any relevant time and no guardian had yet been sought or appointed for her or her property.
The brief filed on behalf of I.L. includes this succinct statement of her argument:
The term "accessible" is not defined by the Medicaid regulations. However, the common meaning of "accessible" is "easily approached or entered . . . [e]asily obtained."[[8]] Thus, when the Medicaid regulations are read as a whole, the calculation of resources used to determine eligibility (countable resources under N.J.A.C. 10:71-4.2) is the total resources over which the applicant has the right, authority, or power to liquidate (available resources as defined in N.J.A.C. 10:71-4.1(c)) excluding any resources which are not easily obtained (not accessible resources as set forth in N.J.A.C. 10:71-4.4(b)6). [Internal citation omitted.]
*129 The Verified Complaint for Guardianship, certified by the Administrator of Absecon Manor in September 2004, included these statements of fact:
4. [I.L.] has one daughter, [G.A.T.]. Upon information and belief, [G.A.T.] is domiciled in the Commonwealth of Virginia and her address is unknown to the Facility. [G.A.T.] has neither visited nor communicated with [I.L.] [in] over 2 years, 3 months.
5. [I.L.] has one granddaughter, [K.T.]. [K.T.] is domiciled in New Jersey at [an identified address]. [K.T.] was notified of the Facility's intent to seek guardianship for [I.L.] and has declined to act as guardian to her grandmother.
6. [I.L.] has no other known living next of kin.
. . . .
10. Due to [I.L.'s] incapacity, she is unable to liquidate her alleged resources in order to pay the Facility and reduce the value to a level in which she would qualify for Medicaid benefits.
11. The Facility's interest in this action is that [I.L.] currently resides at and is under the care of the Facility. Due to [I.L.'s] inability to manage her own affairs, and the complete lack of cooperation of [I.L.'s] daughter or granddaughter in providing for [I.L.'s] care at the Facility, [I.L.] is unable to make any health care decisions concerning her care, including providing her specific consent for any treatment which may need to be provided by the Facility.
The scope of our review of an agency decision, whether viewed as an adjudicative action or the interpretation and application of a statute or regulation, is limited. A presumption of validity generally is accorded to the agency's decision, which will be sustained unless it is "arbitrary, capricious, or unreasonable [or] . . . `clearly inconsistent with its statutory mission or with other State policy.'" Brady v. Bd. of Review, 152 N.J. 197, 210, 704 A.2d 547 (1997) (quoting George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994)). See generally, Pressler, Current N.J. Court Rules, Comment 3.4 and Comment 5 on R. 2:10-2 (2006).
Though sometimes subsumed in the search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. [Public Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103, 501 A.2d 125 (1985).]
Deference to an agency decision is particularly appropriate where interpretation of the Agency's own regulation is in issue. See H.K. v. Div. of Med. Assistance & Health Servs., 379 N.J.Super. 321, 327, 878 A.2d 16 (App.Div.) ("An agency's interpretation of its own regulation is entitled to substantial deference.") (quoting DiMaria v. Bd. of Trustees of the Pub. Employees Ret. Sys., 225 N.J.Super. 341, 351, 542 A.2d 498 (App.Div.), certif. denied, 113 N.J. 638, 552 A.2d 164 (1988)), certif. denied, 185 N.J. 393, 886 A.2d 663 (2005). Here, however, we find the agency's interpretation and application of its own regulation to be plainly unreasonable.
We are sensitive to the Legislature's intent, stated in the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5, as amended, "to provide medical assistance, insofar as practicable, on behalf of persons whose resources are . . . [inadequate]" as well as *130 to ensure that all available federal funds are obtained for that purpose and that Medicaid benefits "shall be the last resource benefits." See N.J.S.A. 30:4D-2. Nonetheless, we do not read the Director's decision to be compelled or even consistent with that balanced intent.
As the Division states in its brief, with respect to the life insurance policies, "until these resources were spent below the applicable Medicaid eligibility limit, here $2,000, [I.L.] was not eligible for benefits." It is clear to us that if the policies' cash values had been "accessible" to I.L. (either directly or through an appointed guardian) her $3,913 excess of resources over the $2,000 limit, would have been spent down on her behalf within a very short time.[9] We emphasize the obvious fact that the required spend down would have occurred if anyone had had access to that resource as of June 1, 2002, since I.L.'s nursing home stay obviously had a substantial cost. See N.J.A.C. 10:71-4.10(m)1. When the Public Guardian finally was appointed to oversee I.L.'s person and property, that resource was quickly spent down.
Under the circumstances, I.L. was eligible for benefits on June 1, 2002 because the resource upon which the Division based its denial of eligibility was inaccessible to her and therefore excludable. It was arbitrary and unreasonable, and contrary to the underlying purpose of the Medicaid program providing benefits to cover skilled nursing home care for needy individuals, for the Board and then the Division to deny benefits to I.L. When her relatives failed to move for authority to access the policies in 2002, while the second application was before the Board, and when no one else with authority to do so moved either to access the policies or to have a guardian appointed for I.L.'s person and property, the Board at the very least could have acted on the application in a timely fashion, putting the nursing home on notice of the need to act.
In any event, once the facts were before the Division, it should have been apparent that I.L.'s circumstances required recognition that the cash values of her life insurance, while theoretically accessible to I.L. through an appointed guardian, were not in fact accessible until the guardian's appointment, a circumstance that existed "through no fault of her own." See N.J.A.C. 10:71-4.4(b)6.
The matter is remanded to the Division to calculate the benefits that should have been available to I.L. or for her care, as of June 1, 2002, and to consider Absecon Manor's entitlement to reimbursement for her care under the applicable guidelines.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] "Medicaid Only" appears to be the term applied to the program for needy persons who qualify only for medical benefits, but not other benefits, such as income maintenance or food stamps.
[2] N.J.A.C. 10:71-1.5 states:

The Medicaid Only program is administered by the county boards of social services (CBOSS) of the State of New Jersey through the Division of Medical Assistance and Health Services in the Department of Human Services. The CBOSSs contract with the Division of Medical Assistance and Health Services for the purpose of providing Medicaid Only benefits to eligible persons.
[3] Given what we have learned about the disposition of I.L.'s bank accounts, it should be no surprise that documentation to verify her eligibility was not supplied with the applications submitted by her daughter and granddaughter.
[4] Bank records show that a "closing withdrawal" of $21,493.47, the balance of one certificate of deposit, held jointly in the names of I.L. and her daughter, was made on September 14, 2001. A "closing withdrawal" of $15,666.99, the balance of a second certificate of deposit held jointly in the names of I.L. and her daughter, was made on April 30, 2002. The record does not disclose whether any action has been taken to recover those funds, but the Division does not contend that I.L.'s eligibility after June 1, 2002 is affected thereby.
[5] N.J.A.C. 10:71-2.5(c)4 permits an application to be made on behalf of an individual who is a resident of a skilled nursing facility by a designated staff member of the facility.
[6] The Initial Decision and the parties' briefs erroneously state that the cash surrender values of the policies were approximately $3,077, $1,162, and $2,435. Those figures reflect the policies' death benefit as of July 1, 2004, rather than the cash surrender values of the policies.
[7] The rejection letter was mailed to I.L.'s old address. The nursing home apparently learned of the denial in August 2003.
[8] Webster's Third New International Dictionary provides several definitions of "accessible," including the second definition: "capable of being reached or easily approached." Webster's Third New Int'l Dictionary 11 (Merriam-Webster 1993).
[9] As noted above, once the Public Guardian gained access to the policies, they were liquidated and the excess spent down in less than six weeks, between November 19, 2004 and January 1, 2005, when I.L. was finally deemed eligible for benefits.