**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2996-17T1

H.R.,

     Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES and ATLANTIC
COUNTY BOARD OF SOCIAL
SERVICES,

     Respondents-Respondents.

_____

Submitted December 9, 2019 – Decided January 2, 2020

Before Judges Sumners and Natali.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Cowart Dizzia, LLP, attorneys for appellant (Jenimae Almquist, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney

General, of counsel; Nicholas Logothetis, Deputy
Attorney General, on the brief).

PER CURIAM

H.R. appeals the January 24, 2018 final agency decision of the Director of the Division of Medical Assistance and Health Services (DMAHS) that denied him Medicaid benefits.[1] We affirm.

I.

In approximately July 2016, H.R. was hospitalized after his mobile home was destroyed in a fire. On July 19, 2016, he was transferred to the Hammonton Center for Rehabilitation and Healthcare (Hammonton Center) where he became a full-time resident. Due to H.R.'s significant cognitive impairment and functional deficits, the Hammonton Center filed a complaint on September 23, 2016, seeking the appointment of a guardian of H.R.'s person and his estate. A hearing was set for December 7, 2016, but was adjourned to January 11, 2017. During this period the court did not appoint a temporary guardian.

On January 11, 2017, the court entered a judgment of legal incapacity and appointed a guardian. The judgment required the guardian to "enter into a surety

---

[1] As detailed, infra, H.R. died during the pendency of these proceedings, and his estate has prosecuted the action since his death. We nevertheless refer to petitioner as H.R. for ease of reference.

A-2996-17T1

bond unto the Superior Court of New Jersey in the amount of $50,000," before receiving letters of guardianship. In a February 23, 2017 order, however, the court waived the bond requirement and ordered the Surrogate to issue letters of guardianship, which the guardian received that day. Additionally, the court ordered H.R.'s bank account with Fulton Bank ending in *9008 to be "paid over to the Hammonton Center." The court further required all future Social Security and Veteran's Administration benefits to be directed to the Hammonton Center.

On December 23, 2016, while H.R.'s guardianship was still pending, the Hammonton Center filed a Medicaid application with the Atlantic County Board of Social Services (ACBSS) on H.R.'s behalf. On February 6, 2017, the Atlantic County Medicaid Long Term Care Unit (LTC Unit) denied H.R.'s application, as H.R. "failed to provide documents needed to make [a] determination." The guardian testified before the Administrative Law Judge (ALJ) that she asked a caseworker "whether she needed to request a [f]air [h]earing or if [ACBSS] w[as] building off of the [December 2016] Medicaid application." She further testified that the caseworker "told her to keep getting her the information requested." Neither the guardian nor the Hammonton Center requested a fair hearing with respect to the denial of H.R.'s December 2016 Medicaid application.

3

On March 8, 2017, the guardian filed a new Medicaid application for the wrong program on H.R.'s behalf, and ACBSS, accordingly, did not accept the application. Notably, in a letter accompanying the application, the guardian represented that the combined value of H.R.'s real property was $2500.

The guardian filed another Medicaid application on March 13, 2017, this time for the correct program. In this application, the guardian represented that the fair market value of H.R.'s real property was $5000. Additionally, she identified three bank accounts that H.R. owned: 1) a Fulton Bank account ending in *9008 with a balance of $6460.94; 2) a Fulton Bank account ending in *2538 with a nominal balance of $13; and 3) a Univest Bank account ending in *7463 with a $7677.95 account value. A Univest Bank account ending in *2581 with an account value of $63.08 was later identified.

According to the guardian's testimony before the ALJ, she learned of the Univest account on March 12, 2017, in the course of a discussion with H.R.'s friend at the hospital. She maintains that she contacted Univest by telephone and received confirmation that Univest would prepare the relevant paperwork so she could appropriately disburse those funds, but that she was unable to travel to Univest to execute the necessary documents as she was at the hospital with H.R.

 A-2996-17T1

On March 17, 2017, H.R. passed away.  Approximately one week later, on March 23, 2017, the court entered a consent order which required that H.R.'s Fulton Bank "account ending in *9008 shall be paid over to the Hammonton Center, except [that]:  1) $1406 shall be paid to Sara Winstock, Esq[.;] [and] 2) $1205.45 shall be paid to Egg Harbor Township" to satisfy existing and future tax debt on two lots of land that H.R. owned.  At the end of March 2017 or April 2017, the account ending in *9008 was spent down consistent with the March 23, 2017 consent order and the account was closed.

On April 27, 2017, H.R.'s March 13, 2017 Medicaid application was denied by the LTC Unit as H.R. was deceased and "over-resourced," as his estate was "over the $2000 resource limit."  ACBSS never received information or documentation that H.R.'s *9008 account was spent down, but Barbara Paugh, an Administrative Supervisor with ACBSS, testified that "even if the [*9008] account was not counted towards the resource limit, H.R.'s estate would still have been over the $2000 resource limit."

On May 9, 2017, the guardian filed a request for a fair hearing with respect to the denial of H.R.'s March 13, 2017 Medicaid application.  The DMAHS transmitted the matter to the Office of Administrative Law (OAL), and the OAL held a hearing on August 3, 2017.  The ALJ heard testimony from the guardian,

5

Paugh, and Jannell Thomas, the Medicaid Coordinator at the Hammonton Center.

At the August 3, 2017 hearing, the guardian testified that after she presented her letters of guardianship, it took almost two weeks to obtain H.R.'s account information from Fulton Bank, due to the bank's legal processes. The guardian further stated that she went to the Social Security Administration office twice in order to "determine where [H.R.'s] social security was being deposited." Before receiving the information, however, she left due to the wait time.

With respect to H.R.'s Univest Bank account, the guardian confirmed that she learned of the account on March 12, 2017 from H.R.'s friend at the hospital, and contended that it was ACBSS' responsibility to inform her of the existence of the Univest Bank account. As to H.R.'s real property, the guardian testified that she did not obtain an appraisal, but that the property was "not worth anything."

The ALJ issued her initial decision on October 30, 2017. With respect to the December 2016 Medicaid application, the ALJ found that "[n]o [f]air [h]earing request was filed on the denial of the . . . [Hammonton Center's] application."

A-2996-17T1

In considering the March 13, 2017 Medicaid application, the ALJ noted that because H.R. was a full-time resident of the Hammonton Center, his "real property became an eligible resource that [ACBSS] was required to consider in determining H.R.'s Medicaid eligibility at the time of filing." She added that H.R. offered no credible evidence to dispute the $19,300 tax assessed value of H.R.'s real property. Further, the ALJ found that while H.R.'s Fulton Bank account was not a countable resource because it was subject to the court's March 23, 2017 spend down order, the Univest Bank account was not included in the order and was therefore an includable resource in determining H.R.'s Medicaid eligibility. Accordingly, the ALJ concluded that H.R. was "over the resource limit of $2000 thereby making him ineligible for Medicaid . . . ."

On January 24, 2018, the Director of DMAHS issued a final agency decision adopting the ALJ's initial decision "as to the finding that [p]etitioner is not eligible for benefits" with respect to the March 13, 2017 Medicaid application. The Director noted that H.R. "had a guardian who had authority to access [his] assets." In this regard, the Director concluded that H.R.'s assets, "including the bank accounts that exceeded $7000 and real estate, were correctly applied to the Medicaid standard and [ACBSS] correctly found him ineligible for benefits." However, because it was unclear whether H.R.'s application "was

reviewed for retroactive benefits as he did not acknowledge unpaid medical bills on the March 2017 application," the Director returned the matter to ACBSS to determine H.R.'s eligibility for retroactive benefits under N.J.A.C. 10:49-2.9(b) and 42 U.S.C. § 1396a(a)(34).[2] This appeal followed.

On appeal, H.R. makes three primary arguments. First, he maintains that DMAHS' denial was arbitrary and capricious because the decision "improperly deemed H.R.'s unknown and inaccessible bank accounts and property as 'resources' under Medicaid regulations in direct conflict with applicable law." Specifically, H.R. claims that his cognitive impairment, his death, the state of his land, the delay in issuing letters of guardianship, and the guardian's difficulty receiving information from the financial institutions, rendered H.R.'s resources unavailable. In addition, H.R. asserts that "the ALJ erroneously held a high value against [him] in relation to the land where his trailer had stood before a fire led to his institutionalization." H.R. further claims that "the value of a resource that is inaccessible through no fault of the applicant is expressly excluded by N.J.A.C. 10:71-4.4(b)(6)."

_____

[2] As noted in DMAHS' merits brief, H.R. was deemed eligible for and granted retroactive Medicaid benefits only for the months of December 2016 and January 2017.

Second, H.R. contends that the DMAHS ignored the fact that the guardian "had no authority to request a fair hearing at the time that the [December 23, 2016] application was denied in February of 2017," and therefore "H.R. was deprived of reasonable backdating of his eligibility date." Additionally, he asserts that ACBSS interfered with his ability to request a fair hearing by: 1) failing to send the guardian the February 2017 denial letter, and 2) continuing to solicit and accept information after the denial, "indicating the application was still being processed" and therefore should be estopped from denying the calculation of benefits from the date of the first application.

Finally, H.R. claims DMAHS' decision is punitive and capricious as it discriminated on the basis of disability and that denying Medicaid benefits to an incapacitated individual awaiting a guardian like H.R. "undermines the availability of long-term care to debilitated and elderly New Jersey citizens."

II.

Our role in reviewing an agency decision is limited. R.S. v. Div. of Med. Assistance and Health Servs., 434 N.J. Super. 250, 260-61 (App. Div. 2014) (citing Karins v. Atl. City, 152 N.J. 532, 540 (1998)). We "defer to the specialized or technical expertise of the agency charged with administration of a regulatory system." In re Virtua-W. Jersey Hosp. Voorhees for Certificate of

A-2996-17T1

Need, 194 N.J. 413, 422 (2008) (citing In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004)).  "[A]n appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence."  Ibid. (citing In re Herrmann, 192 N.J. 19, 28 (2007)).

Further, a presumption of validity attaches to the agency's decision.  Brady v. Bd. of Review, 152 N.J. 197, 210 (1997); In re Tax Credit Application of Pennrose Props., Inc., 346 N.J. Super. 479, 486 (App. Div. 2002).  The party challenging the validity of the agency's decision has the burden of showing that it was arbitrary, capricious, or unreasonable.  J.B. v. N.J. State Parole Bd., 444 N.J. Super. 115, 149 (App. Div. 2016) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006)).  "Deference to an agency decision is particularly appropriate where interpretation of the [a]gency's own regulation is in issue." I.L. v. N.J. Dep't. of Human Servs., Div. of Med. Assistance and Health Servs., 389 N.J. Super. 354, 364 (App. Div. 2006) (citing H.K. v. Div. of Med. Assistance and Health Servs., 379 N.J. Super. 321, 327 (App. Div. 2005)). Nevertheless, "an appellate court is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'"  R.S. v.

Div. of Med. Assistance and Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting Mayflower Sec. Co. v. Bureau of Sec. in Div. of Consumer Affairs of Dep't. of Law & Pub. Safety, 64 N.J. 85, 93 (1973)).

"The Medicaid program, established by Title XIX of the Social Security Act, is a joint federal-state program designed to provide medical care for indigent, disabled[,] and elderly persons." United Hosps. Med. Ctr. v. State, 349 N.J. Super. 1, 4 (App. Div. 2002) (citing 42 U.S.C. § 1396). Once a state "chooses to participate[,] [it] must operate its program in compliance with the federal statute and regulations." Ibid. (citing Harris v. McRae, 448 U.S. 297, 301 (1980)). "The state must adopt 'reasonable standards . . . for determining eligibility for . . . medical assistance [that are] consistent with the objectives of the Medicaid program[,]' and 'provide for taking into account only such income and resources as are . . . available to the applicant.'" In re Estate of Brown, 448 N.J. Super. 252, 256 (App. Div. 2017) (citations omitted) (first quoting Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 166 (1998); then quoting N.M. v. Div. of Med. Assistance & Health Servs., 405 N.J. Super. 353, 359 (App. Div. 2009)).

The New Jersey Medical Assistance and Health Services Act (Act), N.J.S.A. 30:4D-1 to -19.5, "establishes the statutory framework for the

implementation of New Jersey's Medicaid program." In re A.N., 430 N.J. Super. 235, 243 (App. Div. 2013). "DMAHS is the 'single State agency' responsible for administering New Jersey's Medicaid program." Ibid. (citing N.J.S.A. 30:4D-4 and -5; N.J.A.C. 10:49-1.1). "Such administration includes the promulgation and adoption of regulations governing qualification for Medicaid benefits, as well as serving as gatekeeper to prevent individuals from using Medicaid to avoid payment of their fair share for long-term care." W.T. v. Div. of Med. Assistance & Health Servs., 391 N.J. Super. 25, 36-37 (App. Div. 2007). County welfare agencies are responsible for determining Medicaid eligibility. N.J.S.A. 30:4D-7a.

Under the Medicaid eligibility standards, "participation in the program shall be denied or terminated if the total value of an individual's resources exceeds [$2000]." N.J.A.C. 10:71-4.5(c). Pursuant to N.J.A.C. 10:71-4.1(b), "a resource shall be defined as any real or personal property which is owned by the applicant . . . and which could be converted to cash to be used for his or her support and maintenance." Further, "[i]n order to be considered in the determination of eligibility, a resource must be 'available.'" N.J.A.C. 10:71-4.1(c). A resource is "available" when "[t]he person has the right, authority[,]

or power to liquidate real or personal property or his or her share of it . . . ."
N.J.A.C. 10:71-4.1(c)(1).

III.

We reject petitioner's first argument that all of his assets were "unavailable" or not "accessible" for purposes of evaluating the amount of his available resources under the applicable regulations. In support of his argument, petitioner primarily relies on I.L., 389 N.J. Super. at 354. That case, however, is factually inapposite.

In I.L., the court was confronted with the issue of "whether an individual is eligible for . . . Medicaid . . . when she was the legal owner of life insurance whose value ordinarily would have disqualified her . . . , but because she suffered from dementia . . . , and because no guardian had power over her assets, the cash value of the policies was not accessible to her." Id. at 356. The petitioner's Medicaid application was denied because she owned three life insurance policies with a total cash value of $5913, thereby exceeding the resource limit of $2000. Id. at 357. The court appointed a guardian, who "quickly spent down the value of [the] petitioner's life insurance policies." Id. at 361.

The I.L. court concluded that because of I.L.'s mental condition, her life insurance policies were not accessible to her until her guardian's appointment, and, therefore was, at the time of her application, Medicaid eligible. Id. at 365-66. In making its determination, the court stated that "if the policies' cash values had been 'accessible' to I.L. (either directly or through an appointed guardian) her $3913 excess of resources over the $2000 limit, would have been spent down on her behalf within a very short time." Id. at 365.

Here, however, H.R.'s guardian had authority to act on his behalf as of February 2017 when she received the letters of guardianship. Even excepting the Fulton accounts, it was not disputed that the value of the Univest account exceeded the $2000 resource limit. See N.J.A.C. 10:71-4.5(c). While we acknowledge the guardian experienced some difficulty obtaining information regarding petitioner's assets, she was aware of the Univest account, albeit shortly before petitioner's death, and possessed authority to access that resource prior to filing the March 13, 2017 Medicaid application.

Even were we to ignore the Univest account as an available resource as a result of difficulties in the guardian's ability to discover those assets sooner, there was substantial credible evidence in the record to support the DMAHS' decision based on the value of H.R.'s real property.

A-2996-17T1

N.J.A.C. 10:71-4.4 lists excludable resources which "shall not be considered either in the deeming of resources or in the determination of eligibility for participation in the Medicaid Only Program." Pursuant to N.J.A.C. 10:71-4.4(b)(1), "[a] house occupied by the individual as his or her place of principal residence, and the land appertaining thereto, shall be excluded . . . ." "An absence of more than six months," however, "is assumed to indicate that the home no longer serves as a principal residence." N.J.A.C. 10:71-4.4(b)(1)(i). Additionally, under N.J.A.C. 10:71-4.4(b)(6), "[t]he value of resources which are not accessible to an individual through no fault of his or her own" are also excludable.

As noted, as of July 19, 2016, H.R. was transferred to the Hammonton Center and became a full-time resident. Additionally, at the time the guardian filed the March 13, 2017 Medicaid application, H.R. had been absent from his land for over six months. Accordingly, the principal residence exclusion under N.J.A.C. 10:71-4.4(b)(1) does not apply.

Further, by February 2017, the guardian had received the letters of guardianship. She therefore had access to H.R.'s real property and, in fact, listed the land for sale on March 21, 2017. As such, H.R., through the guardian, had access to the land and it was not excludable under N.J.A.C. 10:71-4.4(b)(6).

15                                                    A-2996-17T1

With respect to the land's value, N.J.A.C. 10:71-4.1(d) provides that "[t]he value of a resource shall be defined as the price that the resource can reasonably be expected to sell for on the open market in the particular geographic area minus any encumbrances (that is, its equity value)." N.J.A.C. 10:71-4.1(d)(1)(iv) further provides that "[t]he equity value of real property is the tax assessed value of the property multiplied by the reciprocal of the assessment ratio as recorded in the most recently issued State Table of Equalized Valuations, less encumbrance, if any."

Here, the ALJ and DMAHS properly relied upon the tax assessed value of H.R.'s two parcels of land, which totaled $19,300. In the guardian's corresponding letter accompanying the March 8, 2017 application, she represented that the "combined value" of H.R.'s "two parcels of real estate" was $2500. Five days later, in her second application, the guardian stated the fair market value of H.R.'s real property was $5000. Then, on March 21, the guardian listed the land for sale at $40,000. At the hearing before the ALJ, H.R.'s guardian provided no support, expert or otherwise, for her contention, that the land had minimal value. Accordingly, the DMAHS did not commit error when it concluded the value of H.R.'s eligible land exceeded the $2000 income

16

amount, as that finding was supported by substantial, credible evidence in the record.

IV.

Further, we reject petitioner's claim that the DMAHS deprived H.R. "of reasonable backdating of his eligibility date" by: 1) ignoring his guardian's lack of authority to request a fair hearing when the December 2016 application was denied, 2) failing to send the guardian the February 2017 denial letter, and 3) continuing to accept and solicit supplemental information following the denial.

Pursuant to N.J.A.C. 10:49-10.3(b)(3), "[c]laimants shall have [twenty] days from the date of notice of . . . [agency] action in which to request a hearing . . . ." On February 6, 2017, ACBSS sent the denial letter to the Hammonton Center, who had filed the December 2016 application. While a copy of the denial notice was not sent to H.R.'s guardian, she was nevertheless aware that the application had been denied before receiving her letters of guardianship on February 23, 2017, less than twenty days from the date of the denial letter. Accordingly, H.R.'s guardian could have filed a request for a fair hearing once she became H.R.'s guardian.

We also reject petitioner's claim that DMAHS should be equitably estopped. To invoke that equitable doctrine, a "defendant [must be] engaged in

conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." Knorr v. Smeal, 178 N.J. 169, 178 (2003). However, "[e]quitable estoppel may be invoked against a governmental entity only 'to prevent manifest injustice.'" Bridgewater-Raritan Educ. Ass'n v. Bd. of Educ. of Bridgewater-Raritan Sch. Dist., 221 N.J. 349, 364 (2015) (quoting O'Malley v. Dep't of Energy, 109 N.J. 309, 316 (1987)).

Here, petitioner's assertion that the guardian detrimentally relied on ACBSS's solicitation and acceptance of information after it already denied the December 2016 Medicaid application is without merit. H.R.'s guardian's supposed reliance and belief that the application was still pending is refuted by the fact that she filed new Medicaid applications on March 8 and March 13, 2017, shortly after receiving the letters of guardianship. Accordingly, the DMAHS' decision to deny H.R. backdated coverage is supported by the record and is neither arbitrary, capricious, nor unreasonable.

V.

Finally, we reject H.R.'s claim that the DMAHS' decision discriminated on the basis of his disability and violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 to 12213, by not properly taking into account his

mental incompetence in the application process. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Certainly, H.R. could not be denied public benefits or excluded from a public program on the basis of his disability, but that is not what happened here. H.R., through the Hammonton Center and then his guardian, was able to apply for benefits and there is no indication that he was treated any differently than any other applicant. Rather, H.R.'s application was ultimately denied because his available and accessible assets exceeded the $2000 resource limit at the time of the March 13, 2017 Medicaid application.

To the extent we have not specifically addressed any of H.R.'s arguments it is because we have concluded that they are without sufficient merit and do not warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19                                                                  A-2996-17T1