**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0461-18T4

J.T.,

     Petitioner-Appellant,

v.

DIVISION OF MEDICAL
ASSISTANCE AND HEALTH
SERVICES and GLOUCESTER
COUNTY BOARD OF
SOCIAL SERVICES,

     Respondents-Respondents.

_____

Argued telephonically March 19, 2020 –
Decided April 29, 2020

Before Judges Suter and DeAlmeida.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Carri-ann R. Levine, argued the cause for appellant (Cowart Dizzia, LLP, attorneys; Cari-ann R. Levine, on the brief).

Jacqueline R. D'Alessandro, Deputy Attorney General, argued the cause for respondent Division of Medical Assistance and Health Services (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, on the brief).

John Anthony Alice argued the cause for respondent Gloucester County Board for Social Services.

PER CURIAM

Petitioner J.T.[1] appeals from an August 13, 2018 final decision of the Director, Division of Medical Assistance and Health Services (DMAHS), adopting the initial decision of an Administrative Law Judge (ALJ) finding him ineligible for Medicaid benefits because he failed to submit documents necessary to verify his eligibility. We affirm.

I.

The following facts are derived from the record. On June 21, 2017, J.T.'s daughter, F.T., brought him to Deptford Center for Rehabilitation and Healthcare (Deptford Center) for short-term rehabilitation. J.T. previously executed a power of attorney in favor of F.T. After J.T. was admitted to Deptford Center, F.T. failed to appear for scheduled care meetings and did not

___

[1] We identify petitioner by his initials to protect the confidentiality of his medical records.

respond to communications regarding her father's medical care. Deptford Center did not initially file an application on behalf of J.T. for Medicaid benefits because his stay was expected to be short term.

On August 10, 2017, it became apparent to Deptford Center J.T. would need long-term treatment at its facility. J.T. could not speak and suffered from dementia. In light of F.T.'s absence, on August 15, 2017, J.T.'s son, Ja.T., purported to act on behalf of his father by executing a form designating Cheryl Zuchowski,[2] a Deptford Center employee, as the designated authorized representative (DAR) for J.T.

Zuchowski submitted an application for Medicaid benefits on J.T.'s behalf to respondent Gloucester County Board of Social Services, the county welfare agency (CWA) for Gloucester County. On October 17, 2017, the CWA denied J.T.'s application for failure to provide the asset verification necessary to establish eligibility for the program.

On October 23, 2017, Zuchowski filed a second application for Medicaid benefits on behalf of J.T. The application listed an account at Sun National Bank with a value of $755 as J.T.'s only asset.

---

[2] Zuchowski is also identified in the record as Cheryl Soistmann. Her name change is immaterial to the issues before the court.

A-0461-18T4

On October 31, 2017, Zuchowski sent an email to the CWA seeking advice. She informed the agency of J.T.'s inability to speak or write and that F.T. had "disappeared" and was not returning telephone calls. Zuchowski reported that her efforts to obtain J.T.'s bank records in support of the application had failed because the bank demanded verbal consent of J.T. or approval of F.T. According to Zuchowski, the bank would not accept Ja.T.'s authorization to release the bank records.

On November 8, 2017, a CWA representative responded to Zuchowski's email and suggested she initiate proceedings for the appointment of a guardian for J.T. The CWA also ran an asset verification system report for J.T. in an effort to obtain his bank record. The Sun National Bank account records, however, did not appear on the report.

On November 22, 2017, the CWA informed Zuchowski in writing that the production of statements for J.T.'s Sun National Bank account for the period from August 1, 2016 to October 1, 2017 was necessary to evaluate his eligibility for benefits. The letter stated that "[i]f this information is not received by [December 11, 2017], the case will be denied."

On December 1, 2017, a physician conducted an examination of J.T. He diagnosed J.T. with dementia and probable Alzheimer's disease. Zuchowski did

not inform the CWA of the physician's report or initiate guardianship proceedings for J.T. at that time.

On December 26, 2017, the CWA denied J.T.'s second application. The agency stated it was unable to determine J.T.'s eligibility without the bank records requested in the November 22, 2017 letter.

J.T. died on January 23, 2018. The following day, Deptford Center attempted to initiate guardianship proceedings for J.T. Because J.T. had died, the guardianship petition was not processed.

J.T. challenged the denial of his application through a request for a fair hearing.[3] The matter was transferred to the Office of Administrative Law, where a fair hearing was held before ALJ Susan L. Olgiati.

On July 5, 2018, ALJ Olgiati issued an initial decision recommending the denial of benefits be affirmed. The ALJ determined the maximum forty-five-day period for deciding an application, N.J.A.C. 10:71-2.3(a), applied here and began with the filing of J.T.'s second application for benefits. In light of the denial of J.T.'s first application, the ALJ found his representatives were aware of the need to secure his bank records when they filed the second application.

---

[3] The record does not contain evidence the Administrator of J.T.'s estate authorized Deptford Center to appeal the CWA's decision on his behalf.

The ALJ determined the CWA satisfied its obligation to assist J.T. in securing the information necessary to determine his eligibility. As ALJ Olgiati noted, the CWA suggested initiation of guardianship proceedings before setting the December 11, 2017 deadline. Zuchowski obtained a medical evaluation of J.T. but did not share the results with the CWA, advise the CWA of continued difficulty obtaining J.T.'s bank records, request an extension of the December 11, 2017 deadline, or initiate the guardianship process. In addition, the ALJ found that after the deadline passed, the CWA waited an additional fifteen days, until December 26, 2017, sixty-four days after the application was filed, to issue a denial. ALJ Olgiati found the circumstances surrounding J.T.'s application were exceptional, requiring additional time beyond the maximum forty-five-day period, which the CWA provided.

On August 13, 2018, the Director issued a final decision adopting the ALJ's recommendation. The Director agreed with the ALJ's determination J.T. "failed to provide the needed information prior to the December 26, 2017 denial of benefits. Without this information, the [CWA] was unable to complete its eligibility determination and the denial was appropriate."

This appeal followed. J.T. raises the following arguments for our consideration:

A-0461-18T4

POINT I

THE FINAL DECISION WAS ARBITRARY AND CAPRICIOUS BECAUSE IT HELD J.T. AND HIS ATTORNEY-IN-FACT TO AN IMPOSSIBLE STANDARD CONTRARY TO CONTROLLING LAW.

A.   THE MEDICAL CONDITIONS OF J.T. AND HIS SISTER[4] CREATED EXCEPTIONAL CIRCUMSTANCES, MAKING THE DENIAL IN [EIGHTY-ONE][5] DAYS CONTRARY TO STATE AND FEDERAL LAW.

B.   [THE CWA] OWED A DUTY OF ASSISTANCE, PARTICULARLY TO J.T. WHO WAS PERMANENTLY UNABLE TO COMMUNICATE.

POINT II

THE FINAL AGENCY DECISION WAS CAPRICIOUS BECAUSE IT UNFAIRLY DISCRIMINATES ON THE BASIS OF DISABILITY.

POINT III

RAPID DENIALS OF MEDICAID TO INCAPACITATED RESIDENTS IN NEED OF A

---

[4] J.T.'s brief refers to F.T. both as J.T.'s daughter and J.T.'s sister. ALJ Olgiati's findings of fact identify F.T. as J.T.'s daughter. The exact familial relationship between J.T. and F.T. is immaterial to our legal analysis. In addition, despite the reference in J.T.'s point heading, the record contains no evidence with respect to F.T. having a medical condition.

[5] It is not clear why J.T.'s point heading refers to an eighty-one-day period. As found by ALJ Olgiati and as recognized elsewhere in J.T.'s brief, the CWA denied J.T.'s application sixty-four days after it was filed.

7

GUARDIAN CREATE SERIOUS PUBLIC POLICY
IMPLICATIONS.

II.

"Judicial review of agency determinations is limited." Allstars Auto Grp.,
Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). "An
administrative agency's final quasi-judicial decision will be sustained unless
there is a clear showing that it is arbitrary, capricious, or unreasonable, or that
it lacks fair support in the record." Ibid. (quoting Russo v. Bd. of Trs., Police
& Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). In reviewing the agency's
decision, we consider:

> (1) whether the agency's action violates express or
> implied legislative policies, that is, did the agency
> follow the law;
>
> (2) whether the record contains substantial evidence to
> support the findings on which the agency based its
> action; and
>
> (3) whether in applying the legislative policies to the
> facts, the agency clearly erred in reaching a conclusion
> that could not reasonably have been made on a showing
> of the relevant factors.
>
> [Ibid. (quoting In re Stallworth, 208 N.J. 182, 194
> (2011)).]

"A reviewing court 'must be mindful of, and deferential to, the agency's
expertise and superior knowledge of a particular field.'" Id. at 158 (quoting

Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (internal quotation omitted)).  "A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'"  Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 483 (2007)).  "Deference to an agency decision is particularly appropriate where interpretation of the [a]gency's own regulation is in issue."  R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting I.L. v. N.J. Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 389 N.J. Super. 354, 364 (App. Div. 2006)).  "However, a reviewing court is 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue.'"  Allstars Auto Grp., 234 N.J. at 158 (alteration in original) (quoting Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 302 (2011)).

"Medicaid is a federally-created, state-implemented program that provides 'medical assistance to the poor at the expense of the public.'"  In re Estate of Brown, 448 N.J. Super. 252, 256 (App. Div. 2017) (quoting Estate of DeMartino v. Div. of Med. Assistance & Health Servs., 373 N.J. Super. 210, 217 (App. Div. 2004)); see also 42 U.S.C. § 1396-1.  To receive federal funding

the State must comply with all federal statutes and regulations. Harris v. McRae, 448 U.S. 297, 301 (1980).

Pursuant to the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5, DMAHS is responsible for administering Medicaid in our State. N.J.S.A. 30:4D-4. Through its regulations, DMAHS establishes "policy and procedures for the application process . . . ." N.J.A.C. 10:71-2.2(b). "[T]o be financially eligible, the applicant must meet both income and resource standards." Estate of Brown, 448 N.J. Super. at 257; see also N.J.A.C. 10:71-3.15; N.J.A.C. 10:71-1.2(a).

We begin with J.T.'s argument the CWA provided insufficient assistance in completing his second application. In New Jersey, the Medicaid applicant is "the primary source of information. However, it is the responsibility of the agency to make the determination of eligibility and to use secondary sources when necessary, with the applicant's knowledge and consent." N.J.A.C. 10:71-1.6(a)(2). The CWA must "[a]ssist the applicant[] in exploring their eligibility for assistance[,]" and "[m]ake known to the applicant[] the appropriate resources and services both within the agency and the community, and, if necessary, assist in their use . . . ." N.J.A.C. 10:71-2.2(c)(3) to (4). However, the applicant must: "1. [c]omplete, with assistance from the CWA if needed, any forms required by

the CWA as a part of the application process; 2. [a]ssist the CWA in securing evidence that corroborates his or her statements; and 3. [r]eport promptly any change affecting his or her circumstances." N.J.A.C. 10:71-2.2 (e).

> The CWA shall verify the equity value of resources through appropriate and credible sources. Additionally, the CWA shall evaluate the applicant's past circumstances and present living standards in order to ascertain the existence of resources that may not have been reported. If the applicant's resource statements are questionable, or there is reason to believe the identification of resources is incomplete, the CWA shall verify the applicant's resource statements through one or more third parties.
>
> [N.J.A.C. 10:71-4.1(d)(3).]

The applicant bears a duty to cooperate fully with the CWA in its verification efforts, providing authorization to the CWA to obtain information when appropriate. N.J.A.C. 10:71-4.1(d)(3)(i).

> If verification is required in accordance with the provisions of N.J.A.C. 10:71-4.1(d)[(3)], the CWA shall . . . . verify the existence or nonexistence of any cash, savings or checking accounts, time or demand deposits, stocks, bonds, notes receivable or any other financial instrument or interest. Verification shall be accomplished through contact with financial institutions, such as banks, credit unions, brokerage firms and savings and loan associations. Minimally, the CWA shall contact those financial institutions in close proximity to the residence of the applicant or the applicant's relatives and those institutions which

11

currently provide or previously provided services to the applicant.

[N.J.A.C. 10:71-4.2(b)(3).]

The CWA may perform a "[c]ollateral investigation" wherein the agency contacts "individuals other than members of applicant's immediate household, made with the knowledge and consent of the applicant . . . ." N.J.A.C. 10:71-2.10(a). "The primary purpose of collateral contacts is to verify, supplement or clarify essential information." N.J.A.C. 10:71-2.10(b). Neither N.J.A.C. 10:71-4.1(d)(3) nor N.J.A.C. 10:71-2.10 require a CWA to undertake an independent investigation of an applicant. The agency instead is charged with verifying information provided by an applicant. For example, while N.J.A.C. 10:71-4.2(b)(3) requires the CWA to contact an applicant's financial institutions to verify an account's existence, it does not require the agency to obtain records directly from a financial institution.

After carefully reviewing the record, we conclude there is sufficient support for the Director's determination the CWA fulfilled its obligation to assist J.T. in obtaining the information necessary to determine his eligibility for benefits. J.T.'s representative contacted the CWA eight days after submitting his second application to inform the agency of F.T.'s unavailability, J.T.'s medical condition, and the bank's insistence on securing approval of either F.T.

or J.T. before releasing his bank records. The CWA advised Zuchowski to seek appointment of a guardian for J.T.

In addition, the agency ran an electronic search for J.T.'s bank records, which proved unsuccessful. After waiting more than three weeks from the submission of the application, the CWA set a December 11, 2017 deadline for production of the bank records. As of that date, J.T.'s representative had not initiated guardianship proceedings, informed the CWA of J.T.'s medical evaluation, or reported on the progress, if any, of its efforts to obtain the bank records. J.T.'s representative did not request an extension of the December 11, 2017 deadline or acknowledge it passing. After the deadline passed, the CWA waited an additional fifteen days, during which it received no communication from J.T.'s representative, before denying his application. In the days following the denial of the application, J.T.'s representative did not communicate with the CWA. It was not until January 24, 2018, the day after J.T. died, that Zuchowski attempted to initiate guardianship proceedings. The CWA satisfied its obligation to provide assistance and advice to J.T.'s representative. J.T.'s representative failed to act with sufficient diligence to complete his application.

Nor do we agree with J.T.'s argument the CWA acted inappropriately when it denied his application after sixty-four days. "The maximum period of

13

time normally essential to process an application for the aged is [forty-five] days; for the disabled or blind, [ninety] days." N.J.A.C. 10:71-2.3(a). The regulation recognizes, however,

> that there will be exceptional cases where the proper processing of an application cannot be completed within the [forty-five/ninety-] day period. Where substantially reliable evidence of eligibility is still lacking at the end of the designated period, the application may be continued in pending status. In each such case, the CWA shall be prepared to demonstrate that the delay resulted from one of the following:
>
> 1. Circumstances wholly within the applicant's control;
>
> 2. A determination to afford the applicant, whose proof of eligibility has been inconclusive, a further opportunity to develop additional evidence of eligibility before final action on his or her application;
>
> 3. An administrative or other emergency that could not reasonably have been avoided; or
>
> 4. Circumstances wholly outside the control of both the applicant and CWA.
>
> [N.J.A.C. 10:71-2.3(c).]

The regulation establishes a maximum period for the CWA to process an application. It does not give applicants the right to hold their applications open for forty-five or ninety days to obtain the information necessary to establish eligibility for benefits. While the regulation authorizes a CWA to keep an

14

application in pending status for longer than the prescribed periods, it does not require that it do so in every instance in which an application is incomplete, particularly in the absence of a request for an extension by the applicant. Here, J.T.'s representative did not seek an extension of the December 11, 2017 deadline, either before its expiration or in the fifteen days thereafter before issuance of the December 26, 2017 denial. We see no abuse of discretion in the CWA deciding J.T.'s application sixty-four days after it was filed.[6]

To the extent we have not addressed other arguments raised by J.T., we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] In light of our holding, we need not decide whether the Director's decision applying the forty-five-day period was correct, given J.T.'s apparent disability.

A-0461-18T4