**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0029-24

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

      Petitioner-Respondent,

v.

ALLIED TELECOM CORP.,
VASILIOS STERGIOU,
DIRECTOR AND
INDIVIDUALLY, AND
DEMETRIO POUBOURIDIS,
PRESIDENT AND
INDIVIDUALLY,

      Respondents-Appellants.

_____

      Argued November 12, 2025 – Decided November 25, 2025

      Before Judges Gilson and Vinci.

      On appeal from the New Jersey Department of Labor and Workforce Development.

      Richard A. Grodeck argued the cause for appellants (Piro, Zinna, Cifelli, Paris & Genitempo, LLC, attorneys; Richard A. Grodeck, on the briefs).

Christopher Chiacchio, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Christopher Chiacchio, on the brief).

PER CURIAM

Respondents Allied Telecom Corp., Vasilios Stergiou, and Demetrio Poubouridis (collectively Allied) appeal from an August 29, 2024 final administrative action of the New Jersey Department of Labor and Workforce Development (Department) finding Allied violated the New Jersey Prevailing Wage Act (PWA), N.J.S.A. 34:11-56.25 to -56.98, and the New Jersey Wage Payment Law (WPL), N.J.S.A. 34:11-4.1 to -4.14. We affirm.

Allied is in the business of installing and maintaining wireless communication networks. Stergiou is a shareholder and the director of operations of Allied. Poubouridis is a shareholder and the chief financial officer.

In 2019, Allied performed work on cell towers in connection with ten public works projects in Morris, Passaic, Bergen, Essex, and Ocean Counties (the Projects). In June and July 2019, three employees, including former Allied employee Rafael Rios, filed complaints with the Department alleging Allied failed to pay them the correct prevailing wage rate for their work on the Projects.

Specifically, they claimed Allied improperly paid them the prevailing wage rate applicable to "electrician – teledata" instead of "electrician."

The Department publishes prevailing wage rate determinations on its website for certain crafts performed in each county, which apply to contractors, such as Allied, performing public works projects. On May 10, 2019, the Department published prevailing wage rate determinations applicable to Morris County, which included the crafts of "[e]lectrician" and "[e]lectrician – [t]eledata."

The "comments/notes" section of the wage rate determination applicable to "[e]lectrician" states:

> THESE RATES ALSO APPLY TO THE FOLLOWING:
> -All burglar and fire alarm work.
> -<u>All fiber optic work</u>.
> -Teledata work in new construction.
> -Teledata work involving [sixteen] [v]oice/[d]ata [l]ines or more.
>
> [(emphasis added).]

The "comments/notes" section of the wage rate determination applicable to "[e]lectrician-[t]eledata" states:

> - These rates are for service, maintenance, moves, and/or changes affecting [fifteen] [v]oice/[d]ata (teledata) lines or less. <u>These rates may NOT be used</u>

A-0029-24

for any teledata work in new construction (including additions) or any fiber optic work.

[(emphasis added).]

Allied concedes the wage rate determinations applicable to work performed in Morris, Passaic, Essex, Bergen, and Ocean Couties are substantially the same. There is also no dispute the Projects involved less than fifteen "[v]oice/[d]ata lines" and were not "new construction."

The Department conducted an investigation of the employee complaints, including an audit of Allied's payroll records. In connection with the investigation, Allied provided a spreadsheet detailing the job duties of the employees who worked on the Projects. The descriptions of the job duties in the spreadsheet included: "[t]est fiber connectivity" and "furnish and install telco wire." The spreadsheet stated, "[t]elco wire: [n]ew technology is fiber/[o]lder was [twenty-five] pair."

Allied also provided a letter dated October 28, 2019, describing the scope of the work done on the Projects, which included "[s]wapping . . . [r]emote [r]adio head[s]" and involved "run[ning] a new fiber optic jumper from a[n] . . . outdoor box or squid to the new [r]emote [r]adio [h]ead." The letter stated "[n]ever more than [nine] [remote radio heads] are swapped. So [nine] additional at most fibers would be added."

4

On October 2, 2020, the Department issued assessment letters to Allied for the Projects. The Department determined Allied violated the PWA and the WPL, and assessed unpaid wages, fees, and penalties pursuant to N.J.S.A. 34:11-4.2 and N.J.S.A. 34:11-56.27.[1] Allied contested the assessments.

On February 23, 2021, the Department issued final orders in connection with the Projects compelling Allied to pay the assessments, which totaled approximately $107,542 in unpaid wages, $10,754 in fees, and $40,600 in penalties. The Department also debarred Allied from any public works contracts for a period of three years. Allied appealed and requested a hearing in the Office of Administrative Law.

On April 27, and 28, 2023, an administrative law judge (ALJ) conducted an evidentiary hearing. The Department called the following witnesses: Wayne DeAngelo, an electrician and member of the International Brotherhood of Electrical Workers (IBEW); Ashleigh Chamberlain, the Department employee who served as hearing officer during the investigation; and Rios. Stergiou testified as Allied's only witness.

---

[1] The Department also determined Allied failed to register in violation of N.J.S.A. 34:11-56.51. The determination is not the subject of this appeal.

DeAngelo testified he has been a member of the IBEW, Local Union 260, which has "construction jurisdiction" in Mercer County, Burlington County, and parts of Bucks County, Pennsylvania, for twenty-three years. He is the president and assistant business manager of the local union, and a full-time union representative. Throughout his career as an electrician D'Angelo "specialized in the work of voice and data systems, fiber optics."

DeAngelo testified that when the Department "has a question as to scope of work and whose craft it would fall under" a Department employee "usually sends . . . the question on this type of work and then asks [him] what parameters or what craft that would potentially fall under." This happens "[o]n a monthly basis."

In this case, Department employee Ralph Sheffield provided D'Angelo with the spreadsheet created by Allied and asked him about Allied's "scope of work with power work for [antennas] and . . . if that falls under the parameter of [the IBEW's] collective bargaining agreement" for electricians. D'Angelo advised Sheffield that Allied's work on the Projects would fall within his local union's collective bargaining agreement and each of Allied's employees "would be paid as an inside wireman." The Projects did not fall within the jurisdiction of DeAngelo's local union, but "the majority of the collective bargaining

6

agreements are [ninety-nine] percent the same" and the "scope of work predominantly is the same . . . anywhere in the [S]tate."

Chamberlain testified he was assigned as hearing officer after Allied contested the assessments. He reviewed the spreadsheet created by Allied describing the work performed by its employees on the Projects and "then forwarded it to [his] colleague . . . Sheffield in order to confirm the prevailing wage craft that would be applicable to the work that was described." Sheffield "got back to [him] shortly thereafter and said it was electrician . . . based upon the input from [] D'Angelo[.]"

Based on the information provided by Allied in the spreadsheet and Sheffield's response, Chamberlain concluded, "the work in question would be subject to the prevailing wage craft of electrician" not "electrician[-]teledata." According to Chamberlain, the "prevailing wage is based directly on the collective bargaining agreements of the prevailing construction unions." "Prevailing wage applies to all public work in New Jersey regardless of whether it[ is] performed by a union company or a non-union company."

Rios was employed by Allied from December 2018 until June 2019, when he was terminated for insubordination. Rios testified he worked on the Projects "doing . . . full builds," which is "basically decommissioning a site." He and his

A-0029-24

coworkers would "decommission and add new radios and antennas, fibers. . . . [They would] add radios, antennas, squids, fiber management box. [They would] add fiber spools, power spools."

Rios testified installing a new radio involves "fiber power and jumpers that go[] to the antenna." A "squid" is "a device that goes on a tower. And you run fiber and power through it." The "squid . . . is just strictly power and fiber" and "that squid has to connect to the[] radios." "[T]he radios have a fiber that [gets] connected into the squid and power that [gets] connected into that squid too." When Rios referred to "fiber," he meant "fiber optics."

Rios filed his complaint because he has "years of experience doing" similar work, and "[t]hrough prior companies that [he] did prevailing wage with[,] [he] was always paid at a higher rate." Rios conceded he "never complained about the rate [he was] being paid" while he was employed by Allied and only filed his complaint after he was terminated.

Stergiou testified he was the person responsible for determining the applicable wage rate that Allied paid it employees on the Projects. Allied's work on the Projects "was to go out there on every site and replace the then outdated equipment, antennas, radio[]heads, coax cables, tel[]co lines, whatever it was and replace them, with new ones that [the client] provided." He testified

"telecommunication lines are now fiber" and "fiber" refers to fiber optic wire. Fiber optic wire is used because:

> every network not only wireless, any network requires a medium to transfer either data or voice. . . . [Before] 2010 . . . that was primarily done with the use of thick . . . coax. Twenty-five lines of coax. And then they figured out . . . replacing that with fiber optics, which is basically glass and light, they have tremendous gains from it.

Allied connected the new antennas using a "fiber optic, prefabricated" wire "the client [gave] [Allied] to connect." According to Stergiou, "[i]t[ is] as easy as plugging in your phone into the socket." The materials Allied used on the Projects included "an antenna for each sector, a radio head, a DC wire, fiber optics wire . . . [a]nd the squid if it[ is] required." A squid is actually "called a DC12." For each antenna there are "two coax lines . . . that connect to the antenna and the radio. One fiber that connects to the . . . DC12 or the squid." For each sector on the cell towers, Allied would "swap the antennas. Two new ones. Swap the radio[]heads for new ones. If there[ is] old wire we put the new ones that [the client] provided."

To determine the correct wage rate to pay he has "to take whatever is given to [him] on the Department of Labor's website. . . . [He] ha[s] to look and see

9

A-0029-24

what trade best resembles what [Allied's employees] do."  In connection with the Projects:

> when [he] read electrician, [he was] like okay, my guys are not electricians. When [he saw] underneath it electrician with teledata, [he was] like, yeah that[ is] closer to what [Allied employees] do.  We do some low voltage electrical.  But we also do a lot of teledata.  Teledata meaning voice and data transmissions.  And that[ is] how [he] determine[d] electrician[-]teledata.

He understood "electrician-teledata" meant "any worker that does some electrical work on teledata" and "electrician[-]teledata [was] the closest" to what Allied did.

Based on his prior experience with a different company in "2003, 2002," Stergiou disagreed the work Allied did on the Projects was "fiber optic work." He testified:

> you have to be certified and licensed to do fiber optic work.  You need to know the bend ratings of each fiber. You need to know how to splice it, how to use the . . . fusion machine . . . to splice it.  How to determinate fiber on each end[].  It[ is] a tedious process.  And it[ is] very hard.  The industry does[ not] do this.  Does[ not] allow for this to happen because there[ is] a lot of human error, it costs a lot of money. So, now all the . . . fiber work . . . performed now, it[ is] just prefabricated, pre-terminated fiber that the customer gives us.  That we plug and play. . . . We only plug and play. We use pre-terminated, prefabricated fiber lines.

10

A-0029-24

On May 29, 2024, the ALJ issued his initial decision affirming the Department's final orders. He "found the Department's witnesses credible" and determined "their testimony regarding the work done by Allied on the [P]rojects was consistent with the descriptions provided by Allied." The ALJ also "deem[ed] [Rios] to be a credible witness" because "his testimony regarding [the] work [on the Projects] was supported by the record." The ALJ concluded Stergiou "presented testimony that was not consistent with the evidentiary record" and "gave little weight to [his] determination" of the applicable prevailing wage rate for the Projects.

The ALJ determined:

> the record, including the job descriptions provided by Allied and the credible testimony of Rios, supports the Department's argument that the work done by Allied "involves fiber optic cables and jumpers." . . . the record further supports the Department's argument that the "Prevailing Wage Rates for the Projects specifically note that the '[e]lectrician-teledata' rate does not apply to work that involves 'any fiber optic work'. . . . And because Allied's work on the Projects included fiber optic work, the '[e]lectrician-teledata' rate was not the appropriate rate."

The ALJ found the work at the Projects "involved fiber optic cables and jumpers[,]" the classification for fiber optic work for the Projects is "[e]lectrician," and "the Department . . . met its burden to demonstrate that the

A-0029-24

[Allied] workers on the [P]rojects . . . were improperly paid at the rate for '[e]lectrician-[t]eledata.'"

Allied filed exceptions to the ALJ's initial decision. On August 29, 2024, the Department issued its final administrative decision and after "conduct[ing] an independent evaluation of the record[,] . . . accepted and adopted the findings of fact, conclusion[,] and recommendations of the ALJ." The Department determined "the ALJ . . . produced a thorough and convincing decision" in which he "carefully weighed" the "credibility of each witness and the nature and quality of the evidence." The Department ordered Allied to pay the wages owed, fines, and penalties enumerated in the final orders, and "placed [Allied] on the debarment list."

On appeal, Allied argues the conclusions of the Department were arbitrary, capricious, and unreasonable. Specifically, Allied argues the ALJ's determination that the Projects "included fiber optic work" because the Projects "involved fiber optic cables and jumpers" must be reversed because "[t]he use of plug and play was not sufficient for the Department to conclude that 'fiber optic work' was performed." Allied also contends the "limited rating information" provided on the Department's website "is unconscionably vague and the punitive sanctions which resulted are intolerable[.]"

The scope of our review of an administrative agency's final decision is "limited." Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997); see also Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) ("[j]udicial review of agency determinations is limited"). Our role is to "survey the record to determine whether there is sufficient credible competent evidence in the record to support the agency head's conclusions." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988). We defer to the decision of an agency when it adopts the findings and conclusions of an ALJ, who had the benefit of hearing live testimony and judging witnesses' credibility. Id. at 587-88.

We will disturb an agency's decision only if we determine that the decision is "'arbitrary, capricious or unreasonable'" or is unsupported "'by substantial credible evidence in the record as a whole.'" Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 302 (App. Div. 2022) (citations omitted) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980)). The party challenging the administrative action bears the burden of making the requisite showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

"Deference to an agency decision is particularly appropriate where interpretation of the [a]gency's own regulation is in issue." I.L. v. N.J. Dep't of Hum. Servs., Div. of Med. Assistance & Health Servs., 389 N.J. Super. 354, 364

(App. Div. 2006).  It is well established "[i]n administrative law, the overarching informative principle guiding appellate review requires that courts defer to the specialized or technical expertise of the agency charged with administration of a regulatory system."  In re Application of Virtua–West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008) (citing In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488–89 (2004)).  Nevertheless, we are "'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue.'"  Allstars Auto. Grp., Inc., 234 N.J. at 158 (alteration in original) (quoting Dep't of Child. & Fam., DYFS v. T.B., 207 N.J. 294, 302 (2011)).

We are unpersuaded by Allied's claim that the Department's decision was arbitrary, capricious, or unreasonable.  The applicable wage rate determinations clearly provide that the rate for "[e]lectrician-[t]eledata" "may NOT be used for . . . any fiber optic work," and the rate for "[e]lectrician" applies to "[a]ll fiber optic work."

The Department's determination that Allied's work on the Projects involved "fiber optic work" is amply supported by credible competent evidence in the record.  The spreadsheet provided to the Department by Allied stated the work included "funish[ing] and install[ing] telco wire" and stated "[t]elco wire:

14                                                                        A-0029-24

[n]ew technology is fiber." The spreadsheet also indicated the work included "test[ing] fiber connectivity." Allied's October 28, 2019, letter similarly stated the work involved "run[ning] a new fiber optic jumper from a[n] . . . outdoor box or squid to the new [r]emote [r]adio [h]ead."

Stergiou likewise testified Allied used "fiber optic, prefabricated" wire to connect the antennas to the radio heads. Rios testified the work included installing "squids," "fiber management" boxes, and "fiber spools." Consistent with Stergiou's testimony, Rios testified that the installation of the new radio on the tower involved "fiber power and jumpers that go[] to the antenna."

Based on the competent credible evidence in the record, including Allied's own documents and Stergiou's testimony, the Department determined Allied's work on the Projects included "fiber optic work." Applying our deferential standard of review, there is no basis for us to disturb the Department's decision.

Allied's claim that the Department's wage rate determinations are unconstitutionally vague lacks merit. Civil statutes, and economic regulations in particular, are subject to less stringent scrutiny under the vagueness doctrine than criminal statutes. See In Re Raymour and Flanigan Furniture 405 N.J. Super. 367, 385 (App. Div. 2009). Indeed, "a commercial regulatory statute can be held unconstitutionally vague only if it is 'substantially incomprehensible.'"

Ibid. (quoting In re Loans of N.J. Prop. Liab. Ins. Guar. Ass'n, 124 N.J. 69, 78 (1991)).

Relevant to this case, the question of which wage rate determination applies turns on whether the Projects involved "fiber optic work." The Department concluded Allied's installation of fiber optic cables and jumpers was fiber optic work. As applied to the undisputed evidence in this case, we are convinced the wage rate determinations are not substantially incomprehensible.

To the extent we have not specifically addressed any of Allied's remaining arguments, it is because the Department's decision is supported by sufficient credible evidence on the record as a whole. R. 2:11-3(e)(1)(D).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0029-24